[Civ. No. 37468. Second Dist., Div. Three. June 1, 1971.]

PAUL I. ENGLISH et al., Plaintiffs and Appellants, v.
RALPH WILLIAMS FORD, Defendant and Appellant;
KEY AUTO RECOVERY, INC., Defendant and Respondent.

GATEWAY NATIONAL BANK, Plaintiff, Cross-defendant and Respondent, v.
PAUL I. ENGLISH et al., Defendants, Cross-complainants and Appellants.

(Consolidated Cases.)

## COUNSEL

Morgan D. Goldie for Plaintiffs and Appellants and Defendants, Cross-complainants and Appellants.

Linder, Schurmer, Drane & Bullis, Walter H. Drane and Scott Schurmer for Defendant and Appellant and for Defendant and Respondent.

Plotkin & Saltzburg and Martin F. Goldman for Plaintiff, Cross-defendant and Respondent.

**OPINION**

**COBEY, Acting P. J.**—These are cross-appeals by Paul and Betty English, on the one hand, and Ralph Williams Ford, a corporation, on the other, from a judgment awarding the Englishes $704 in general and punitive damages against Ralph Williams Ford and denying them any recovery against Gateway National Bank and Key Auto Recovery, Inc. The bank was, however, awarded judgment against the Englishes in the principal amount of $2,172.77 and attorney's fees in the amount of $500.

This litigation was occasioned by a used car dealer, known as Intercontinental Auto Imports, Inc., giving a worthless draft to Ralph Williams Ford for a new 1967 Country Squire Station Wagon and Ralph Williams Ford, a new car dealer, then identifying itself as the legal owner of the vehicle on its application for the vehicle's registration in the names of the Englishes and later repossessing the vehicle through the services of Key Auto Recovery, Inc. and thereafter reselling it. The bank financed the purchase of the vehicle by the Englishes from Intercontinental and the award to it represents the balance due on the secured installment promissory note the Englishes gave for the bank's loan to them of $2,700.

We reverse for reasons which we will make clear.

### THE SALES AND REPOSSESSION

On Saturday June 24, 1967 the Englishes visited the showroom of Intercontinental, a licensed and bonded automobile dealer, to inquire whether they could purchase a new 1967 Ford Station Wagon of specified coloring and equipment. Intercontinental did not disclose to the Englishes that it was a used car dealer only and not a new car dealer. An officer of Intercontinental told them that Intercontinental could sell them such a car. The Englishes then negotiated with Intercontinental a written purchase order which they executed. This order specified, among other things, a total cash price of $4,080.60 for the car.[1]

The following Monday or Tuesday Mrs. English went to the bank to see whether the Englishes could borrow the $2,700 they needed to finance this purchase. She filled out and signed the necessary loan application and on Thursday morning the 29th a loan officer of the bank, who was both experienced and expert in new car financing, told her by telephone that their loan had been approved. On the same day the Englishes signed a three-year monthly installment note payable to the bank in the amount of

---

[1]Apparently later this price was increased to $4,105.20 because of the elimination of the trade-in.

$3,064.68; they also signed at the same time a vehicle security agreement covering the station wagon and an authorization to pay Intercontinental $2,700. They received from the bank an automobile draft payable to Intercontinental in this amount.

Meanwhile, apparently on this same Thursday, the salesman of Intercontinental had located a new station wagon meeting the specifications stated in the Englishes' purchase order at Ralph Williams Ford and obtained from Ralph Williams Ford a price for the car of $3,973.14. Ralph Williams Ford had purchased the car from the Ford Motor Company on the previous May 16th. The salesman immediately took a draft drawn by Intercontinental in this amount to Ralph Williams Ford which on the same day, the 29th, turned the car over to Intercontinental in return for the draft and a receipt which stated that no payment had been made for the car. At this time the salesman of Intercontinental told Ralph Williams Ford that the lender in the transaction would be the Automobile Club of Southern California. Ralph Williams Ford, as the new car dealer involved, placed on the windshield of the car a copy of its dealer's report of sale. It also placed elsewhere on the car the car's temporary registration number. This enabled the car to be lawfully operated until license plates and a registration card could be issued by the Department of Motor Vehicles. (See Veh. Code, § 4456.) As soon as the salesman had brought the station wagon over to Intercontinental's place of business, a representative of Intercontinental notified the Englishes that Intercontinental had the car.

Sometime during the afternoon of the 29th Mrs. English went to Intercontinental's place of business to hand them the bank's automobile draft for $2,700 and to pick up the car. She noticed that the copy of the dealer's report of sale on the windshield listed the Englishes as the owners and the Automobile Club of Southern California as the legal owner of the vehicle.[2] She discussed this with an officer of Intercontinental who told her to call the bank, which she did when she got home. The loan officer, who had made the $2,700 loan, told her that he would take care of it.

The next morning Mrs. English went to the Automobile Club of Southern California to see about insuring the car. There she was told again to telephone the loan officer at the bank about the erroneous listing of the Automobile Club of Southern California as legal owner of the vehicle on the dealer's report of sale. She did so and again the loan officer told her that he would take care of the matter. Apparently thereafter on this same day, Friday the 30th, an officer of Intercontinental presented the

---

[2] Mrs. English testified that the bottom portion of the copy of the dealer's report of sale on the windshield was turned under and that therefore she did not see the name thereon of Ralph Williams Ford.

bank's automobile draft to the bank for payment and received from the bank a cashier's check in the amount of $2,700 in return for which he gave to the bank a hand-printed document purporting to be a copy of an application for registration of the vehicle made by Intercontinental. This named the bank as the legal owner of the vehicle.

Intercontinental's draft for $3,973.14, payable to Ralph Williams Ford, was subsequently dishonored. Ralph Williams Ford thereupon changed the designation of legal owner to itself in the application for registration of the vehicle which it prepared and sent to the Department of Motor Vehicles. The certificate of ownership of a registered vehicle is prepared from the application for registration rather than from the previously prepared and transmitted dealer's report of sale. Although prepared at different times and for different purposes the two documents appear to contain substantially identical information.

Consequently the bank never received the certificate of ownership of the station wagon. Sometime around the middle of July 1967 the loan officer of the bank talked to a representative of Ralph Williams Ford and confirmed that the latter had possession of the certificate of ownership of the vehicle showing it to be the legal owner thereof. At this point the loan officer decided to sit tight and see what would happen to the Englishes. What happened was that in about 10 days Ralph Williams Ford directed Key Auto Recovery, Inc., a licensed and bonded repossessor, to repossess the station wagon from the Englishes because according to Ralph Williams Ford, Intercontinental had given Ralph Williams Ford a worthless draft for the car. This repossession was accomplished surreptitiously by Key on August 14, 1967, and the car was delivered to Ralph Williams Ford two days later. Thereafter Ralph Williams Ford filed with the Department of Motor Vehicles an affidavit stating that the repossession had been made because of the Englishes' default in the amount of $3,973.14 [the car's price to Intercontinental] on a conditional sales contract covering the car which had been made between them and Ralph Williams Ford and was dated June 29, 1967. The car was subsequently sold to third parties by Ralph Williams Ford after giving notice of its intention to sell purportedly "under provisions of a conditional contract of sale or security agreement" and Civil Code section 2983.2.[3]

### THE LITIGATION

On or about September 11, 1967, this litigation began with the bank

---

[3]In fact Ralph Williams Ford never had a conditional sales contract covering this vehicle with the Englishes. The only security agreement covering the car was that between the bank and the Englishes.

filing a claim and delivery action for conversion and fraud against the Englishes, Ralph Williams Ford, Intercontinental and certain fictitious defendants, among others, in the Municipal Court of the Inglewood Judicial District. Some seven weeks later the Englishes filed in the Superior Court of Los Angeles County a complaint for conversion of the station wagon against Intercontinental, Ralph Williams Ford and certain fictitious defendants.[4] In this complaint they alleged the purchase of the car from Intercontinental on June 24, 1967, its delivery to them on June 29, 1967 and payment in full of the price of the car by means in part of an automobile loan in the amount of $2,700 from the bank, and the wrongful and malicious repossession of the car by Ralph Williams Ford and others on August 14, 1967. They sought compensatory and punitive damages in the total amount of $14,469.88, aside from interest and damages for loss of use.

On May 17, 1968, prior to service of process upon the Englishes in the municipal court action of the bank but following Ralph Williams Ford's appearance therein, the bank and Ralph Williams Ford through their respective counsel of record stipulated that the municipal court action might be transferred to the superior court for the purpose of consolidating it with the Englishes' action there. Three days later on the basis of the stipulation this consolidation was ordered.

On March 17, 1969 the Englishes filed in the consolidated action a first amended cross-complaint against the bank. This cross-complaint contained three causes of action. In the first cause of action the Englishes sought general damages of $10,000 and punitive damages of $10,000 for the malicious and unlawful attachment of their property. In the second cause of action they prayed for the $1,395.20 they had paid Intercontinental in cash for the station wagon and in the third cause of action they asked for recovery of the $595 they had paid the bank on its installment note. The basis for the second and third causes of action was the alleged negligence of the bank in failing to secure legal title to its collateral, namely the station wagon, and the resulting alleged failure of consideration for the Englishes' obligation on their secured note to the bank.

On or about November 19, 1968 the Englishes and the bank each recovered from the proceeds of Intercontinental's dealer's bond the sum of $296.[5] A writ of attachment subsequently issued out of the superior

---

[4] Among these was Key Auto Recovery, Inc. sued and served as Doe IV.

[5] It was stipulated below between the Englishes and Ralph Williams Ford that any judgment against Ralph Williams Ford in favor of the Englishes should be reduced by $296 less their costs of suit in the municipal court action on the bond.

court in favor of the bank on February 14, 1969, and levies thereunder were made on Paul English's salary and on the English home.

The case went to trial the end of December 1969 on the bank's complaint, the English complaint, the English first amended cross-complaint and the pleadings responsive thereto.

### THE REPOSSESSION CONSTITUTED A CONVERSION

■ Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein. (*Gruber* v. *Pacific States Sav. & Loan Co.*, 13 Cal.2d 144, 148 [88 P.2d 137].) ■ Therefore Ralph Williams Ford's repossession of the station wagon from the Englishes constituted a conversion unless such repossession was legally privileged.

■ In this connection Ralph Williams Ford contends that the only portion of the Uniform Commercial Code applicable to the transactions involved in this case is division 9 on secured transactions and that, by reason of section 2102, division 2 of the code on sales does not apply.

■ We do not so construe section 2102. It reads as follows: "Unless the context otherwise requires, this division applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor does this division impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers." Section 2105, subdivision (1), within the division on sales defines "goods" as generally meaning all movable things other than the money in which the price is to be paid, investment securities and things in action. Therefore sales of automobiles are clearly subject to the sales division of the Uniform Commercial Code unless the remaining language in section 2102 excludes them. ■ Under the facts we have stated neither Ralph Williams Ford's sale of the station wagon to Intercontinental nor Intercontinental's sale of the vehicle to the Englishes was either an unconditional contract to sell or a present sale intended to operate *only* as a security transaction. The final clause of section 2102 is not one excluding particular transactions from the coverage of the Uniform Commercial Code. It merely states that the division on sales of the code does not impair or repeal any statute regulating sales to specified classes of buyers. Since in this opinion we recognize the application of the relevant sections of the Vehicle Code and of the Rees-Levering Act (Civ. Code, § 2981 et seq.) to transactions involved, we give effect to this last clause of section 2102.

Ralph Williams Ford's position under the Uniform Commercial Code would appear to be that since Intercontinental's draft to it in payment for the station wagon was dishonored, it was an unpaid seller and as such was privileged to make itself the legal owner of record of the station wagon and as such it was further privileged to reclaim the car from the Englishes when its demand for payment was ignored. (See Uniform Com. Code, §§ 2702, subd. (2), 2706.)

This position is untenable. According to Vehicle Code section 370 a legal owner of a vehicle is one holding a security interest therein under the Uniform Commercial Code. (See also Veh. Code, § 460; Uniform Com. Code, §§ 9105, subd. (1) (h), (i), 9113; cf. *Graf* v. *Harvey,* 79 Cal.App.2d 64, 70 [179 P.2d 348].) Furthermore section 28 of the Vehicle Code plainly contemplates that any repossession of a vehicle registered under this Code by or on behalf of its legal owner shall be only under the terms of some type of security agreement. (See also Veh. Code, § 5601.) There was no type of security agreement to which Ralph Williams Ford was a party.

Under sections 1201, subdivision (37), and 2401 of the Uniform Commercial Code the retention or reservation of title by a seller of goods, notwithstanding their delivery to the buyer, is a reservation of a security interest in the goods. In this case, however, Ralph Williams Ford did not retain or reserve any title in the station wagon upon its delivery to the buyer thereof from Ralph Williams Ford, namely, Intercontinental; instead it took from Intercontinental a receipt stating that it had not been paid. It therefore had only the rights of an unpaid seller in the vehicle and these rights did not constitute a security interest in the vehicle. Furthermore its right to reclaim the car under Uniform Commercial Code section 2702, subdivision (2) as an unpaid seller was subject to the rights of the Englishes as either good faith purchasers or buyers in ordinary course of business from Intercontinental. (§ 2702, subd. (3).)

In this connection Uniform Commercial Code section 2403, subdivision (1) provides that a purchaser of an unlimited interest in goods acquires not only all the title that his transferor had but also all the title that his transferor had power to transfer. The subsection further provides "A person with voidable title has power to transfer a good title to a good faith purchaser for value"[6] and that when goods had been delivered under a transaction of purchase the purchaser has the power to transfer good title even

---

[6]According to section 1201, subdivisions (19), (33) and (44)(c) a good faith purchaser for value under the Uniform Commercial Code is a person who, among other things, takes delivery of the goods pursuant to a preexisting contract for purchase and is honest in fact in the transaction.

though, among other things, "(b) The delivery was in exchange for a check [see § 3104, subd. (2) (b)] which is later dishonored."[7] (See § 2511, subd. (3).)

The second subsection provides that any entrusting of possession of goods to a merchant (see § 2104, subd. (1)) who deals in goods of that kind gives him power to transfer all rights of the entrustor to a buyer in ordinary course of business.[8]

Subdivision (3) of this section defines entrusting as including, among other things, any delivery or any acquiescence in retention of possession for the purpose of sale regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law.

Moreover Uniform Commercial Code section 9203, subdivision (1) (b) provides that a security interest arising under a sales contract, among others, is not enforceable against either the debtor or third parties unless the collateral is in the possession of the secured party or the debtor has signed a security agreement.

From the foregoing statement of the applicable statutory law it seems clear that Ralph Williams Ford was not privileged to become the legal owner of record of the Englishes' station wagon and that it was not privileged to repossess the vehicle from the Englishes. It never acquired a security interest in the vehicle under a security agreement and its purported perfection of such an interest under Uniform Commercial Code section 9302, subdivision (4) and section 6300 et seq. of the Vehicle Code was illegal. It either sold the vehicle to Intercontinental or it entrusted Intercontinental, a merchant of cars, with possession of the vehicle. In either event its claim of a security interest in the vehicle could not prevail against the Englishes who were either good faith purchasers for value of the vehicle or buyers thereof in the ordinary course of business.

Finally, even if we assume for the purpose of this discussion only, that Ralph Williams Ford had a security interest in this station wagon, Uniform Commercial Code section 9203, subdivision (1) rendered such security

---

[7]This may represent a change in preexisting California law. (See *McKee* v. *Peterson*, 214 Cal.App.2d 515, 519-520 [29 Cal.Rptr. 742]; 1 Cal. Commercial Law (Cont. Ed. Bar 1966) § 14.11, pp. 631-632.)

[8]Uniform Commercial Code section 1201, subdivision (9) defines a buyer in ordinary course of business as one who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course of business from a person in the business of selling goods of that kind.

interest unenforceable under the circumstances of this case. (See 1 Cal. Commercial Law (Cont.Ed.Bar 1966) § 14.12, pp. 632-33.) Accordingly we hold that the repossession of the station wagon on August 14, 1967 from the Englishes by Key Auto Recovery, Inc. and Ralph Williams Ford was both wrongful and fraudulent.

### OTHER ERRORS REGARDING THE CONVERSION

■ The denial of recovery against Key Auto Recovery, Inc. was clearly erroneous since Key repossessed the station wagon for Ralph Williams Ford. (*Weinberg* v. *Dayton Storage Co.,* 50 Cal.App.2d 750, 756-757 [124 P.2d 155].) ■ Likewise the damages in the amount of $704 ($1,000 less $296) awarded the Englishes for the conversion of the station wagon was clearly inadequate. (See Civ. Code, § 3336; *Haigler* v. *Donnelly,* 18 Cal.2d 674, 681 [117 P.2d 331]; *Sloss* v. *General Motors Accept. Corp.,* 48 Cal.App.2d 574, 579 [120 P.2d 85]; *Ferraro* v. *Pacific Fin. Corp.,* 8 Cal.App.3d 339, 351 [87 Cal.Rptr. 226].) ■ In view of the bank's failure to perfect its security interest in the station wagon and in view of its obtaining a writ of attachment against other property of the Englishes following the vehicle's repossession, it thereby abandoned any interest it might otherwise have had in the recovery of damages for conversion of the station wagon. Accordingly, on retrial damages for this conversion should be awarded exclusively to the Englishes.

### THE JUDGMENT OF NONSUIT GRANTED THE BANK WAS ERRONEOUS

■ Upon the conclusion of the Englishes' case, the trial court granted the bank a judgment of nonsuit pursuant to Code of Civil Procedure section 631.8 on the ground that the bank had followed normal and customary banking practices in disbursing the proceeds of its $2,700 loan to the Englishes on the basis of the hand-printed application for registration presented to it by Intercontinental. In so acting the court apparently ignored Mrs. English's testimony that prior to the bank's giving Intercontinental its cashier's check for $2,700, Mrs. English had twice told the loan officer of the bank, who made the loan and who gave the cashier's check to an officer of Intercontinental, that the copy of the dealer's report of sale on the windshield of the car named the Automobile Club of Southern California as legal owner rather than the bank.[9] We note further that the

---

[9]This testimony of Mrs. English was received without objection. The trial court in the new trial proceedings before it did make an additional finding to the effect that the Englishes, when accepting delivery of the station wagon, *may* have observed on the windshield of the car a report of sale naming the Automobile Club of Southern California legal owner. The bank's loan officer, although called as an adverse witness by the Englishes, was not asked about these two telephone calls to him.

bank issued its cashier's check to Intercontinental upon a hand-printed copy of what purported to be Intercontinental's application for registration instead of the carbon copy one would normally expect. We believe that under these circumstances a reasonably prudent lender would have at the very least physically inspected the copy of the dealer's report of sale on the windshield of the vehicle, which copy incidentally showed Ralph Williams Ford and not Intercontinental as the dealer, to see what name appeared thereon as legal owner of the vehicle and then inquired of Intercontinental prior to handing to its officer the cashier's check as to why these two discrepancies existed.[10]

The portion of the judgment awarding the bank the principal amount of $2,172.77 against the Englishes as the unpaid balance due upon their installment note to the bank appears to be correct, but in view of the reversal of the remainder of judgment of nonsuit in favor of the bank, we believe that this portion of the judgment (including the award of attorney's fees) should be reversed as well for possible set-off purposes.

As to the correctness of the portion of the judgment relating to the Englishes' first cause of action against the bank for unlawful attachment, we express no opinion. It seems apparent that the Englishes acquiesced in the jurisdiction of the superior court over the consolidated action by filing a cross-complaint therein which, as amended, sought monetary relief in excess of that jurisdictionally available in the municipal court. (See Code Civ. Proc., § 89.) The declaration for writ of attachment filed by the bank on November 22, 1968, however, may possibly be defective in that no claim is made therein that the bank's security under the security agreement, the

---

Furthermore, even though this fact was called to the attention of counsel for the bank, the bank failed thereafter to recall him to the stand.

[10]Apparently no representative of the bank ever saw the station wagon. We express no opinion on whether, notwithstanding the language in the security agreement between the bank and the Englishes to the effect that it was the responsibility of the Englishes to obtain a certificate of ownership for the vehicle naming the bank legal owner, the bank was under a duty when it learned that Ralph Williams Ford had the certificate of ownership of the vehicle in its possession and that the certificate named Ralph Williams Ford legal owner rather than the bank, to take immediate appropriate legal action to protect not only its own security interest in the vehicle but also the Englishes' interest in the vehicle as well. (Cf. *Connor* v. *Great Western Sav. & Loan Assn.*, 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609].)

In this connection we note that our Supreme Court has recognized that contracts between parties of disproportionate bargaining strengths may impose obligations upon the party presenting such a contract to the weaker bargaining party on a "take it or leave it" basis. (*Gray* v. *Zurich Insurance Co.*, 65 Cal.2d 263, 268-271 [54 Cal.Rptr. 104, 419 P.2d 168].) The security agreement here may fit the description of a contract of adhesion as the court defined one in *Gray*. It is a standardized contract prepared by the stronger bargaining party to meet its special needs.

station wagon, has become valueless by reason of its repossession and subsequent sale to third parties. As to this point, again we express no opinion.

The judgment is reversed for further proceedings consistent with the views expressed in this opinion. Appellants English shall recover their costs on appeal; the other parties to these cross-appeals shall bear their own costs.

Schweitzer, J., and Allport, J., concurred.

Petitions for a rehearing were denied June 17, 1971, and the petitions of appellant Ralph Williams Ford and respondents Key Auto Recovery, Inc. and Gateway National Bank for a hearing by the Supreme Court were denied July 28, 1971.