516 F.2d 1313
 1975-1 Trade Cases 60,319, 16 UCC Rep.Serv. 1199
 Armen DE FILIPPO and Sheldon Fleishman t/a A & S, a partnership
v.
FORD MOTOR COMPANY, a Delaware Corporation, et al.,
Appellant in No. 74-1877.
Armen DE FILIPPO and Sheldon Fleishman t/a A & S, a
partnership, Appellants inNo. 73-1878,
v.
FORD MOTOR COMPANY, a Delaware Corporation, et al.
 Nos. 74-1877, 74-1878.
 United States Court of Appeals,
Third Circuit.
 Argued March 17, 1975.
Decided May 8, 1975.
 
 H. Francis DeLone, Richard G. Schneider, Richard R. Rulon, Stephen A. Stack, Philadelphia, Pa., for appellant in No. 74-1877, Ford Motor Co; Dechert Price & Rhoads, Philadelphia, Pa., of counsel.
 Walter W. Rabin, Hurd Baruch, Philadelphia, Pa., for De Filippo and Fleishman as appellees in No. 74-1877 and as appellants in No. 74-1878; Meltzer & Schiffrin, Philadelphia, Pa., of counsel.
 Before ALDISERT, GIBBONS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 Cross appeals from a judgment entered after a jury's answers to special interrogatories require us to decide whether the district court erred (1) in applying a principle of per se unreasonableness to conduct of Ford Motor Company and certain Philadelphia area Ford dealers allegedly in violation of § 1 of the Sherman Act and (2) in applying the Pennsylvania Statute of Frauds to defeat plaintiffs' recovery for breach of contract. We reverse the district court's resolution of the Sherman Act issue and affirm its action in interpreting the Uniform Commercial Code's Statute of Frauds.
 
 
 2
 Ford appeals from a judgment of $2,250,000 plus attorneys' fees of $384,357 entered for plaintiffs on a count charging that Ford and its Philadelphia dealers engaged in a concerted refusal to deal with plaintiffs, which constituted a per se violation of § 1 of the Sherman Act.[1] Plaintiffs Armen De Filippo and Sheldon Fleishman appeal from the entry of judgment for defendant as a matter of law on the count alleging breach of contract by Ford for the sale of a Ford dealership known as Presidential Motors.
 
 I.
 
 3
 Plaintiffs became Ford dealers at Chestnut Motors, Inc. in West Philadelphia in 1969. Less than nine months later part of the facilities, leased from the previous dealer, was destroyed by fire. Thereupon plaintiffs and Ford discussed the possibility of plaintiffs' acquiring another dealership in the city. On December 18, 1969, plaintiffs signed an instrument, found by the jury to be a contract, according to which they were to purchase the assets, less realty, of Presidential Motors. The real estate was to be leased by plaintiffs from Ford. The instrument also contemplated that plaintiffs would be credited with the value of their interest at Chestnut undiminished by the fire;[2] that no risk capital would be invested by plaintiffs for an original period of three (3) months, after which they would put in twenty per cent (20%) of the capital; and that plaintiffs would defer payment of fifty per cent (50%) of the first year's rent and twenty-five per cent (25%) of the second year's rent until the fourth and fifth years of the dealership.
 
 
 4
 When news of the proposal reached other Philadelphia area Ford dealers, they protested to Ford the delayed investment and deferred rent provisions. Ford's legal department advised Ford that the deferred rent provision was unacceptable unless also offered to other dealers, obviously fearing a conflict with the Robinson-Patman Act.[3] Thereafter Ford's representatives discussed the possibility of deferred rent plans with other dealers. Ford even considered the purchase and lease-back of dealer-owned real estate so that the deferred rents could be offered to all dealers. Significantly, it is clear from the record that any implementation of the plans was contingent upon acceptance of plaintiffs' proposal.
 
 
 5
 Further problems, however, were posed by dealers who did not wish to sell to and lease back from Ford, and by dealers who believed that they might be injured as a result of the delayed investment feature of the Presidential proposal. Ultimately, therefore, the vice-president and general manager of Ford travelled to Philadelphia, announced to the Philadelphia dealers that Ford would not consummate the Presidential proposal with plaintiffs, and instructed the Philadelphia sales manager that he had no objection to plaintiffs' assuming the Presidential dealership without the delayed investment and deferred rental terms. Plaintiffs made no response to an offer to discuss such a deal. They then filed this lawsuit, including a Sherman Act count, a count for breach of contract, and a count asserting a violation of the Automobile Dealers' Day in Court Act.[4]
 
 
 6
 After the jury answered special interrogatories, the court entered judgment for plaintiffs on the Sherman Act count. Based on the jury's responses, the court also entered an initial judgment for plaintiffs on the contract claim. However, it thereafter "molded" a verdict for Ford, ruling as a matter of law that the lack of Ford's signature rendered the instrument unenforceable against Ford for noncompliance with the Statute of Frauds provision of the U.C.C. relating to sale of goods.[5] The jury found a violation of the Dealers' Day in Court Act, but also found plaintiffs sustained no damages therefrom.[6]
 
 II.
 
 7
 In order to apply the provisions of the Sherman Act to the facts as found by the jury, it is first necessary to consider the teachings of the Supreme Court. On its face § 1 of the Sherman Act prohibits "(e)very contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States." The necessity for some sort of narrowing interpretation of this language was pointed out by Mr. Justice Brandeis in Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), where he observed that "(e )very agreement concerning trade, every regulation of trade, restrains." (Emphasis added). As the Court has explained through Mr. Justice Black, the result has been that "the courts have construed (§ 1) as precluding only those contracts or combinations which 'unreasonably' restrain competition." Northern Pacific Ry. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).
 
 
 8
 In certain situations the Court has presumed the required "unreasonableness"; that is, the Court has determined that the situations constitute per se violations of § 1. As explained by Mr. Justice Black:
 
 
 9
 (T)here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. . . . Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 210 (60 S.Ct. 811, 838, 84 L.Ed. 1129); division of markets, United States v. Addyston Pipe & Steel Co. (6 Cir.), 85 F. 271, affirmed, 175 U.S. 211 (20 S.Ct. 96, 44 L.Ed. 136); group boycotts, Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457 (61 S.Ct. 703, 85 L.Ed. 949); and tying arrangements, International Salt Co. v. United States, 332 U.S. 392 (68 S.Ct. 12, 92 L.Ed. 20).
 
 
 10
 Ibid.
 
 
 11
 Addressing the specific type of activity upon which plaintiffs relied to bring this case within the ambit of per se unreasonableness, the Court teaches:
 
 
 12
 Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category. 5 They have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they "fixed or regulated prices, parcelled out or limited production, or brought about a deterioration in quality." Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 466-468 (61 S.Ct. 703, 85 L.Ed. 949). Cf. United States v. Trenton Potteries Co., 273 U.S. 392 (47 S.Ct. 377, 71 L.Ed. 700). Even when they operated to lower prices or temporarily to stimulate competition they were banned. For, as this Court said in Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 213 (71 S.Ct. 259, 260, 95 L.Ed. 219), "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Cf. United States v. Patten, 226 U.S. 525, 542 (33 S.Ct. 141, 145, 57 L.Ed. 333).
 
 
 13
 Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212, 79 S.Ct. 705, 709, 3 L.Ed.2d 741 (1959).
 
 
 14
 The inquiry in any case seeking to apply this rule of per se unreasonableness must be whether or not the activities of defendants properly fall within the "group boycott" categorization. The necessity for careful delineation of the boundaries of this per se category was aptly expressed in Worthen Bank & Trust Co. v. National Bank Americard, Inc., 485 F.2d 119, 125 (8th Cir. 1973), cert. denied, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974):
 
 
 15
 The term "group boycott" . . . is in reality a very broad label for divergent types of concerted activity. To outlaw certain types of business conduct merely by attaching the "group boycott" and "per se" labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.
 
 
 16
 Accordingly, we have reviewed the case law employing the group boycott concept.
 
 
 17
 In Fashion Originators' Guild of America, Inc. v. Federal Trade Comm'n, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), the members of a large association of textile and garment manufacturers refused to sell to certain retailers. The clear purpose of the combination was the "intentional destruction of one type of manufacture and sale which competed with Guild members." Ibid. at 467, 61 S.Ct. at 708. In addition, the Court noted the "many respects" in which the activities of the Guild ran afoul of the policies of the antitrust laws, including their "tendency to monopoly." Ibid. at 465, 467, 61 S.Ct. 703.
 
 
 18
 In the early case of Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308 (1923), a national organization of motion picture film distributors, deciding not to sell to an exhibitor, "put an end to his participation in that business." Ibid. at 311, 44 S.Ct. at 100.
 
 
 19
 Klor's, supra, also involved exclusion of a dealer from the market. In that case manufacturers and distributors of electrical appliances allegedly had conspired with a major retailer, Broadway-Hale, either not to sell to Klor's or to sell to it only at discriminatory prices, and had taken from Klor's "its freedom to buy appliances in an open competitive market and drive(n) it out of business as a dealer in the defendants' products." 359 U.S. at 213, 79 S.Ct. at 710. The Court further emphasized that the group activity alleged was "not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship," ibid. at 212, 79 S.Ct. at 709, but rather a "wide combination consisting of manufacturers, distributors and a retailer." Ibid. at 213, 79 S.Ct. at 710.
 
 
 20
 Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914), involved the attempted coercion of wholesalers by an association of lumber retailers who refrained from dealing with those wholesalers that were selling directly to consumers.
 
 
 21
 More recently in United States v. General Motors Corp., 384 U.S. 127, 146, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966), the Court has instructed that "(t)he principle of these cases is that where businessmen concert their actions in order to deprive others of access to merchandise which the latter wish to sell to the public, we need not inquire into the economic motivation underlying their conduct." There, the agreement was to eliminate sales by General Motors' dealers to discounters. The Court emphasized that "inherent in the success of the combination . . . was a substantial restraint upon price competition . . . ." Ibid. at 147, 86 S.Ct. at 1331.
 
 
 22
 Kiefer-Stewart Co. v. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), also involved a restraint upon price competition. The complaint charged an agreement or conspiracy "to sell liquor only to those . . . wholesalers who would resell at prices (below maxima) fixed by (defendants), and that this agreement deprived (plaintiff) of a continuing supply of liquor." Ibid. at 212, 71 S.Ct. at 260. The Court reinstated a judgment for plaintiff.
 
 
 23
 From all this we are able to conclude that a concerted activity constitutes a "group boycott" and is considered per se "in restraint of trade" when "there (is) a purpose either to exclude a person or group from the market, or to accomplish some other anti-competitive objective, or both." Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 76 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970), cited with approval in Ark Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093, 1094 (3d Cir. 1972) (per curiam).III.
 
 
 24
 In the case at hand the district court submitted the issue of antitrust liability to the jury by three special interrogatories and the jury answered as follows:
 
 
 25
 1. Do you find that the plaintiffs have established by a preponderance of the evidence that Ford's failure to deal with the plaintiffs on the terms set forth in the documents signed by plaintiffs on December 18, 1969, was the result of a contract, combination or conspiracy entered into between Ford and the Philadelphia area Ford dealers?
 
 Yes X No______
 
 26
 If you have answered question 1 "Yes", then proceed to answer question 2.
 
 
 27
 If you have answered question 1 "No", then proceed to answer question 7 (which concerned plaintiffs' claim under the Automobile Dealers' Act).
 
 
 28
 2. Do you find that plaintiffs have shown by a preponderance of the evidence that the purpose of the agreement, if any, between Ford and its Philadelphia area dealers was to prevent plaintiffs from becoming Ford dealers in the greater Philadelphia area on any terms?
 
 Yes______ No X
 
 29
 If you have answered question 2 "Yes", then proceed to answer question 4 (which concerned antitrust injury and causation).
 
 
 30
 If you have answered question 2 "No", then proceed to answer question 3.
 
 
 31
 3. Do you find that plaintiffs have shown by a preponderance of the evidence that the agreement, if any, between Ford and its dealers to reject plaintiffs' terms for the acquisition of Presidential's assets constituted an unreasonable restraint of trade?
 
 Yes X No______
 
 32
 If you have answered question 3 "Yes", then proceed to answer question 4.
 
 
 33
 If you have answered questions 2 and 3 "No", then proceed to answer question 7.
 
 
 34
 We quickly reject appellees' contention that the jury's affirmative answers to interrogatories Nos. 1 and 3 in this case constitute a sufficient factual finding by the jury to sustain the judgment of antitrust liability. Appellees' Brief at 16. The first interrogatory was clearly limited to the element of agreement; the jury found only a "contract, combination, or conspiracy entered into between Ford and the Philadelphia area Ford dealers." Second, plaintiffs' case was tried strictly on a theory of per se illegality and not under the "rule of reason". Thus the district court held, and the parties agreed, that interrogatory No. 3 was improvidently submitted to the jury.
 
 
 35
 Thus, the sole inquiry before the district court, as it is before us, was whether there is a factual basis for sustaining the contention that the combined action of Ford and the other Philadelphia dealers constituted a "group boycott", as that category has been defined by the teachings of the Supreme Court.
 
 IV.
 
 36
 The jury found as a fact that the purpose of the combination was not "to prevent plaintiffs from becoming Ford dealers in the greater Philadelphia area on any terms." (emphasis added). The district court properly observed:
 
 
 37
 The present agreement did not appear to take from plaintiffs their access to Ford dealerships in an "open competitive market;" it merely prevented plaintiffs from acquiring a dealership on special terms. Nor did the present agreement seem to deprive Ford of its freedom to sell to plaintiffs "at the same prices and conditions made available to (its other dealers)."
 
 
 38
 DeFilippo v. Ford Motor Co., 378 F.Supp. 456, 463 (E.D.Pa.1974). The district court, however, apparently found the illicit purpose of the combination to emerge from (1) the withdrawal of the offer to plaintiffs of special terms for delayed investment capital and deferred rentals and (2) a finding by the court and not by the jury "that these terms, or substantially equal terms, were offered to the other dealers." Ibid. at 464; see ibid. at 466.
 
 
 39
 Even assuming the propriety, in a post-trial jural environment, of a trial court's assumption of a fact-finding role entrusted in the case at hand to a jury, the district court's fact finding simply cannot be sustained. It is not supported in the record.
 
 
 40
 The court found such support in an offer made to one Kerry Pacifico by Dennis Wiggins, the Ford regional manager, on January 7, 1970. Appellant effectively responds:
 
 
 41
 It is this conversation of January 7 upon which Judge Newcomer placed primary reliance for his finding that Ford was willing to deal with plaintiffs' competitors on terms it rejected when proposed by plaintiffs (ibid. at 465). He quoted from Wiggins' testimony, but the key portion of the passage makes clear that Ford was willing to offer other dealers deferred rent only in the event that it first accepted plaintiffs' proposal:
 
 
 42
 "Q. O.K., Well, this problem that you considered the most important one, the one about the deferred rent that if you offered it to Armen and Shelley you'd have to offer it to everybody?
 
 
 43
 A. Yes.
 
 
 44
 Q. Well, you kind of already had gone partway on that in your January 7th meeting with Mr. Pacifico. You'd already told him that if the deal went through with Armen and Shelley he could have the same deal and you'd buy his place?
 
 A. Yes." (618a-19a; emphasis added)
 
 45
 Wiggins' testimony does not establish, as the lower court suggests, that Ford was willing to grant rent concessions to other dealers but not to plaintiffs or that Ford was unwilling to deal with plaintiffs on terms equal to those provided to other dealers. On the contrary, it shows that, to assure equal treatment of all dealers, Ford was willing to make the same rent concession available to them conditional upon Ford's acceptance of the deferred rent proposal made by plaintiffs.
 
 
 46
 Appellant's Brief at 14-15 (footnote omitted) (emphasis in brief).
 
 
 47
 Other evidence cited by the court in support of its conclusion, 378 F.Supp. at 465, that the deferred rent plan was re-offered to other dealers after plaintiffs' offer had been rejected does not withstand examination. That evidence consists of plaintiffs' repeated attempts to establish this point on cross-examination of a Ford dealer, James Matthews, with the witness' repeated response: "I do not recall . . . . I do not know. . . . I can't answer that. I do not know. . . . I do not know, sir." Appendix at 422a-24a. A disavowal of knowledge may not serve as a legitimate substitute for positive evidence. Moreover, the statement that "(t)hey did have a rent-concession policy that they used under certain conditions, if it was in order . . . .", ibid. at 423a, is no more supportive of the district court's conclusion than Wiggins' testimony.
 
 
 48
 The district court erred in assuming a conclusion, contrary to the evidence adduced at trial, to support its legal determination of an illicit group boycott.
 
 
 49
 Distilled to its essence, the group activity of Ford and its Philadelphia area dealers blocked only the "special terms" arrangement between Ford and plaintiffs. Whatever common law right of action against the other Ford dealers for interference with a contract may have accrued to plaintiffs, the concerted action did not constitute a group boycott in the sense of a per se unreasonable restraint of trade. Plaintiffs were not deprived of the opportunity to become a Ford dealer or to purchase products on the same basis as other dealers. They were deprived simply of the benefits of a contract offered to them at special terms. Such a deprivation, even if the product of concerted action, does not violate § 1 of the Sherman Act. See Part II, supra. Having failed to prove their case, plaintiffs are not entitled to recovery and the judgment in their favor on the Sherman § 1 count will be reversed.
 
 
 50
 Since we determine that the district court erred in entering judgment for plaintiffs on the basic antitrust claim, we also must set aside the award of $354,357 in attorneys' fees. 15 U.S.C. § 15 (1970); see Byram Concretanks, Inc. v. Warren Concrete Products Co., 374 F.2d 649 (3d Cir. 1967).
 
 V.
 
 51
 We next turn to plaintiffs' cross appeal urging as error the district court's ruling that any contract between plaintiffs and Ford was unenforceable under the Pennsylvania Statute of Frauds because the instrument was not signed by Ford.
 
 
 52
 After several weeks of negotiations, the parties met on December 18, 1969. Plaintiffs had been under the impression the meeting would culminate in a contract for their acquisition of Presidential Motors. Instead, during the meeting they signed an instrument in letter form stating, inter alia : "The undersigned partnership hereby offers to purchase" the assets described in an accompanying exhibit, and "If the offer is accepted by you, the partnership shall have the right to assign its interest therein to" a Dealer Development corporation. Appendix at 170ex. The jury concluded from this evidence that the parties had entered a contract on December 18th, answering the following interrogatory in the affirmative:
 
 
 53
 16. Do you find that plaintiffs have shown by a preponderance of the evidence that, at the December 18, 1969 meeting at the offices of Wolf, Block, Schorr and Solis-Cohen, plaintiffs and defendant entered into a contract for the acquisition of Presidential Motors and its operation by plaintiffs as franchised Ford dealers which was contingent only upon approval of the deferred rent terms by Leaseco, which approval was communicated to plaintiffs on December 29, 1969?
 
 
 54
 Although we think the sufficiency of the evidence supporting this finding is suspect, and the existence of a contract at best tenuous, we approach the question from the same perspective as the district court: Assuming there to be a contract, is it enforceable?
 
 
 55
 The district court concluded that the nature of the alleged contract involving a sale of goods for a purchase price of more than $500 and a lease in excess of three years in duration subjected it to two provisions of Pennsylvania's Statute of Frauds. Pa.Stat.Ann. tit. 12A, § 2-201 (1970); ibid., tit. 68, §§ 250.201-250.203 (1965). On appeal, Ford contends initially that the district court was correct. Alternatively, Ford urges that the alleged contract was one for the sale of a business which is a contract for the sale of "personal property", and that, in the absence of a signed written memorandum, the U.C.C. limits plaintiffs' recovery to $5,000. Ibid., tit. 12A, § 1-206 (1970); see Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1144-45 (3d Cir. 1972).
 
 
 56
 Whether the December 18th instrument was subject to the U.C.C. Statute of Frauds for the sale of goods, see n.5 supra, as the trial court concluded, depends on whether the subject matter of the sale falls within the contemplation of "goods" as that term is defined in U.C.C. § 2-105, Pa.Stat.Ann. tit. 12A, § 2-105 (1970).[7] Accordingly, our analysis begins with an examination of the documents involved in the December 18th transaction.
 
 
 57
 Accompanying the letter signed by plaintiffs were several exhibits, the principal one of which was entitled, "Assets to Be Sold and Computation Price". The document listed: parts and accessories, miscellaneous inventories, work in process, equipment, leasehold improvements, service vehicles, new vehicles, demonstrators, used vehicles, daily rental vehicles, leased vehicles, notes receivables, vehicle receivables, parts and service receivables, contracts covering services, and used car warranties. The exhibit also established a formula for deferring rent on the premises owned by Ford's subsidiary, Leaseco, specifically set forth a method for computing the cost of inventories, and provided: "The purchase price to be paid by the Buyer for the assets to be sold shall be the aggregate sum determined in accordance with the computations and the inventories to be made as specified herein, less $65,000."[8] Appendix at 186ex.
 
 
 58
 The parties agree that Pennsylvania law governs the contract issue. Although no Pennsylvania cases under U.C.C. § 2-105 treat the transfer of the assets of an automobile dealership, the Pennsylvania courts had held that the prior Sales Act governed the sale of a whole business. See, e. g., Siskin v. Cohen, 363 Pa. 580, 582, 70 A.2d 293, 294-95 (1950). In addition, other jurisdictions have held that motor vehicles are "goods". Park County Implement Co. v. Craig, 397 P.2d 800, 802 (Wyo.1964); English v. Ford, 17 Cal.App.3d 1038, 1046, 95 Cal.Rptr. 501, 505 (1971).
 
 
 59
 For their part, plaintiffs claim an analogue in Field v. Golden Triangle Broadcasting, Inc., 451 Pa. 410, 305 A.2d 689 (1973), cert. denied, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974). There, the Pennsylvania Supreme Court was concerned with an agreement for the sale of two radio stations, including FCC licenses and various physical assets. The seller sought to invoke that provision of the U.C.C. which allows a seller to demand adequate assurance of performance and, in the absence thereof, to suspend his performance. U.C.C. § 2-609, Pa.Stat.Ann. tit. 12A, § 2-609 (1970). The court stated: "We do not believe that Article 2 of the UCC applies to the instant contract. Rather than being an agreement for the sale of 'goods', this is a contract for the sale of the businesses of two radio stations, including their tangible and intangible assets, as a going concern." 451 Pa. at 422, 305 A.2d at 696.
 
 
 60
 We believe that Field offers plaintiffs little comfort for two reasons. First, the above quoted statement is not a strong holding, but mere dictum, for the court ultimately found:
 
 
 61
 (W)e have already indicated that the security which is provided for the entire contract is adequate. . . . Clearly, where adequate assurance of performance is already present, and there has been no change in circumstances to give rise to reasonable grounds for insecurity, a demand for additional security under section 2-609 is not justified.
 
 
 62
 Ibid. at 424, 305 A.2d at 696-97. Second, the factual complex in Field is distinct from that in the instant case. There, only $30,000 of the total purchase price of $650,000 or 4.6 per cent represented physical assets, including non-movables such as towers and fences. This is to be contrasted with the proposed sale of Presidential Motors in which, we agree with Ford's assessment, the value of movables to be sold was well in excess of three times the value of assets not properly classified as "goods".[9]
 
 
 63
 For the Statute of Frauds relating to the sale of goods to become applicable, we do not believe every asset subject to the sale must qualify under the "movable" test of U.C.C. § 2-105. See n.7 supra. Rather than a view of mechanical technicality or of mathematical nicety, a view of the reasonable totality of the circumstances should control the characterization of the contract for sale. If, viewed as a whole, it can be concluded that the essential bulk of the assets to be transferred qualify as "goods", then it is appropriate to consider the transaction a "contract for the sale of goods". To insist that all assets qualify as "goods" would substantially thwart the intentions of the drafters of the Uniform Commercial Code; it would sanction the absurd. The agreement of sale and purchase could cover physical, movable assets, thus qualifying as "goods", as well as other assets such as receivables from their particular lines not so qualifying. But to segregate "goods" assets from "non-goods" assets, and to insist that the Statute of Frauds apply only to a portion of the contract, would be to make the contract divisible and impossible of performance within the intention of the parties.
 
 
 64
 We believe it preferable to utilize a rule of reasonable characterization of the transaction as a whole. Applying this rule to the facts before us and carefully examining the list of assets to be sold, we note that title to no real estate was to pass in the transaction, nor was any value assigned for good will or the value of the business as a going concern. Accordingly, we have no hesitation in agreeing with the district court's applying U.C.C. § 2-201 and its finding that the alleged contract was unenforceable for want of the signature of Ford Motor Company.[10]
 
 VI.
 
 65
 Finally, we reject cross-appellants' argument for a new trial limited to damages for the violation of the Dealers' Day in Court Act. We are persuaded that the question of damages was properly presented to and fully addressed by the jury.
 
 
 66
 This issue is controlled by the interrogatory submitted to the jury:
 
 
 67
 12. What figure, if any, do you find accurately represents the value of plaintiffs' interest in Chestnut Motors on the date plaintiffs were terminated as dealers?
 
 
 68
 A. None.
 
 
 69
 Plaintiffs had become Ford dealers at Chestnut Motors, Inc., in West Philadelphia early in 1969 under a "Dealer Development" arrangement in which they put up twenty per cent (20%), or $60,200, and Ford put up eighty per cent (80%) of the investment required to purchase the dealership from the previous dealer. Under the plan, plaintiffs were to buy out Ford's interest with dealership profits, if any. Fire destroyed part of the Chestnut Street facilities, which were leased from the previous dealer, only eight and one-half months after plaintiffs entered the venture. During the negotiations for the purchase of Presidential Motors subsequent to the fire, the parties agreed that plaintiffs would be credited with their interest in Chestnut "valued as of the date of the fire (and undiminished by losses suffered in the subsequent distress operations)." Appellant's Brief at 4; see n.2 supra. The figure assigned to this value, however, is not controlling on the instant question for two reasons. First, it was an item for negotiations preliminary to contract. Second, and more important, any damages to which plaintiffs might have been entitled under the Dealers' Day in Court Act would have to be assessed as of the date of the wrongful termination April 9, 1970.
 
 
 70
 Trial testimony revealed that the Chestnut Street operation was officially closed down as of March 1, 1970. E. g., Appendix at 371a. Also in evidence and available for the jury's consideration was a certified public accountant's revised and corrected Statement of Income (Loss) for Chestnut Motors during the four-month period ending April 30, 1970. This document showed net sales of $403,873 and a cost of sales of $421,468 or a gross sales loss of $17,595. Added to this were selling, general and administrative expenses of $172,125, or a total loss from operations of $189,720. Other expenses amounted to $3,236, resulting in a net loss for the period of $192,956. Appendix at 341ex. From this information, the jury could well have found that, by the time Ford terminated plaintiffs' franchise at Chestnut Motors on April 9, 1970, post-fire losses had reduced the value of plaintiffs' interest in the operation to zero. Under these circumstances, we cannot disturb the jury's determination that plaintiffs should recover no damages under the Dealers' Day in Court Act.[11]
 
 VII.
 
 71
 We have considered carefully all other contentions of the cross-appellants and find them devoid of merit.
 
 
 72
 The judgment of the district court will be reversed with a direction to enter judgment in favor of appellant Ford Motor Company.
 
 
 
 [1]
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal
 15 U.S.C. § 1 (1970).
 
 
 [2]
 It is unclear whether the amount assigned to this value was approximately $85,000 or $100,000. Compare Appellant's Brief at 4 and Appellees' Brief at 6 with N.T. 475. The discrepancy in the figure, however, need not detain us as it is immaterial to our resolution of the issues
 
 
 [3]
 15 U.S.C. § 13 (1970):
 (d) Payment for services or facilities for processing or sale.
 It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.
 (e) Furnishing services or facilities for processing, handling, etc.
 It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.
 
 
 [4]
 15 U.S.C. § 1222 (1970). Authorization of suits against manufacturers; amount of recovery; defenses
 An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: Provided, That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith.
 
 
 [5]
 Pa.Stat.Ann. tit. 12A, § 2-201 (1970). Formal Requirements; Statute of Frauds
 (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.
 (2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.
 (3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable
 (b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or
 (c) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2-606).
 
 
 [6]
 The court directed a judgment in favor of the two other named defendants
 
 
 [5]
 See, e. g., Eastern States Lumber Assn. v. United States, 234 U.S. 600 (34 S.Ct. 951, 58 L.Ed. 1490); Binderup v. Pathe Exchange, Inc., 263 U.S. 291 (44 S.Ct. 96, 68 L.Ed. 308); Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457 (61 S.Ct. 703, 85 L.Ed. 949); Kiefer-Stewart Co. v. Seagram & Sons, 340 U.S. 211, 214 (71 S.Ct. 259, 95 L.Ed. 219); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 625 (73 S.Ct. 872, 97 L.Ed. 1277); Northern Pacific R. Co. v. United States, 356 U.S. 1, 5 (78 S.Ct. 514, 2 L.Ed.2d 545)
 
 
 [7]
 Section 2-105 provides in part:
 (1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (Section 2-107).
 (2) Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are "future" goods. A purported present sale of future goods or of any interest therein operates as a contract to sell.
 (3) There may be a sale of a part interest in existing identified goods.
 The official comment to the section amplifies as follows:
 
 
 [1]
 Subsection (1) on "goods": The phraseology of the prior uniform statutory provision has been changed so that:
 The definition of goods is based on the concept of movability and the term "chattels personal" is not used. It is not intended to deal with things which are not fairly identifiable as movables before the contract is performed.
 The use of the word "fixtures" is avoided in view of the diversity of definitions of that term. This Article in including within its scope "things attached to realty" adds the further test that they must be capable of severance without material harm thereto. As between the parties any identified things which fall within that definition become "goods" upon the making of the contract for sale.
 
 
 [8]
 The Buyer was to receive the leasehold improvements valued at $35,000 at no additional charge. Appendix at 144ex, 173ex
 
 
 [9]
 The purchase price for Presidential was accounted for entirely by inventory and equipment (i. e., "goods") with the single exception of certain receivables . . . . These receivables had a net value of only $76,828 . . . . This amount for "non-goods" was much less than the value of the "goods" plaintiffs were purchasing. The net asset value of the inventory alone (excluding the new cars, trucks and demonstrator vehicles which would have been financed and thus not paid for by part of the purchase price) amounted to.$254,189 . . . . To this should be added the net asset value of the equipment plaintiffs offered to purchase which cannot be calculated precisely from Exhibit D-108 because the equipment value stated there included diagnostic equipment which plaintiffs were not purchasing
 Ford's reply brief at 31 n.36 (record references omitted).
 
 
 [10]
 Because of the view we take, it is unnecessary to reach the applicability of U.C.C. § 1-206 or of the Statute of Frauds relating to leases of more than three years in duration
 
 
 [11]
 The jury, by its answers to interrogatories Nos. 7 and 11, found that Ford had not acted in good faith in terminating the Chestnut Motors dealership. Notwithstanding however, the jury found that plaintiffs suffered no damages. The district court thereupon properly molded the verdict to enter judgment for Ford. This judgment is consistent with the jury's responses. F.R.Civ.P. 49(a); see Halprin v. Mora, 231 F.2d 197 (3d Cir. 1956); Voelkel v. Bennet, 31 F.Supp. 506, 510 (E.D.Pa.), aff'd, 115 F.2d 102 (3d Cir. 1940)