In re SKILLED TRADES COMPANY, INCORPORATED, Bankrupt,

Joseph A. CHRYSTLER, Trustee, Plaintiff,

v.

SOUTH BEND SUPPLY CO., Defendant.

Bankruptcy No. NK 78–00248 B 8.

United States Bankruptcy Court, W. D. Michigan.

Dec. 3, 1979.

Stanley, Davidoff, Long & Gray, David Davidoff, Kalamazoo, for plaintiff.

O'Connor & Tushla, Paul E. Deats, Cassopolis, and James M. Miller, South Bend, Ind., for defendant.

## OPINION

DAVID E. NIMS, Jr., Bankruptcy Judge.

### PREFERENTIAL TRANSFER—BUILDERS TRUST FUND—ANTECEDENT INDEBTEDNESS

Joseph A. Chrystler, the duly appointed, qualified, and acting trustee in bankruptcy, filed a complaint for the recovery of alleged preferential transfers of $7,466.13. No objection to the summary jurisdiction of the court was raised.

There is no dispute that the transfers in question were within the four month period immediately preceding the filing of a voluntary petition. However, as to one of the transfers, the defendant denies that the transfer was of property of the debtor, that it was for an antecedent debt, that the debtor was insolvent at the time of the transfer, and that defendant had "reasonable cause" to believe that the debtor was insolvent, Bankruptcy Act of 1898, Secs. 60a and 60b, 11 U.S.C. Sec. 96 (1970), which Statute is effective in this case, Bankruptcy Reform Act of 1978. Pub.L. 95–598 Title IV Sec. 403(a). It is agreed, that, if all other elements of Secs. 60a and 60b are proved, the transfer would enable defendant to obtain a greater percentage of his debt than some other creditor of the same class.

The court is satisfied that the debtor was insolvent at the time of the transfer. Income tax returns, the schedules filed in this case, and the testimony of the debtor's president and general manager conclusively establish this fact.

Defendant had been a supplier for bankrupt since about 1972. Most of the business had been on an open account basis until the fall of 1976 when the defendant informed bankrupt that it would only deal with it on a C.O.D. basis. At this time, bankrupt gave defendant a balance sheet that showed assets of $173,000 and liabilities of $152,000; but, this was for the period of May 1, 1976, to October 1, 1976, the best period of the year. Also, bankrupt's president told a representative of defendant that bankrupt was solvent. But, defendant would then sell to bankrupt only if a check were given. However, bankrupt would then ask defendant to hold checks because funds were not available and there were no funds to cover the checks in the bank. On inquiry, the defendant obtained trade information that bankrupt was slow to pay and further information was refused. Then, between the dates of July 18, 1977, and August 22, 1977, eight checks were returned for insufficient funds. Defendant acknowledged that it had never had this experience with a customer before. Defendant then notified bankrupt it would not deal with it unless it had a certified check at the time of delivery.

Around October of 1977, bankrupt required materials for an air conditioning job for Church of Christ, Buchanan, Michigan. It discussed the matter with defendant, and a representative of defendant and bankrupt's president met with the trustees of the church. It was agreed that defendant would ship the materials to the site of the church and that bankrupt would pay defendant when it got its payment from the church. The church agreed, through its board of trustees, to pay $8,000 when all equipment was received. The only written evidence of the contract were three "sales orders," two of which were initialed but none signed. These orders furnish the following information:

| Date of Order | Purchaser | Shipped To | Invoice Date | Shipping Date | Amount |
|---|---|---|---|---|---|
| Oct. 14, 1977 | Skilled Trades | Church of Christ | Oct. 31, 1977 | | $4114.25 |
| Oct. 14, 1977 | Skilled Trades | Church of Christ | Nov. 11, 1977 | Nov. 14, 1977 | 1548.00 |
| Oct. 14, 1977 | Skilled Trades | Skilled Trades | | | 1513.20 |

The first two orders were clearly marked "C.O.D." However, on the first order, in the box marked "Credit," initials indicated approval.

The only evidence available on the question indicated that the last delivery was made November 14, 1977, by defendant's truck. The court will take judicial notice

that Buchanan is approximately 16 miles from South Bend, Indiana.

A check, dated November 15, 1977, in the sum of $8,000, was issued by the church made payable to Skilled Trades Company. A check dated November 17, 1977, in the sum of $7,175.45 was issued by bankrupt, made payable to South Bend Supply. This check was certified by the bank on the same date and was apparently endorsed by one bank on November 22, 1979, and marked paid November 25, 1977. According to bankrupt's president, he notified the church the day the last shipment arrived, and, he received the check the next day or the day after.

From the above facts, the court is satisfied that the defendant not only had reasonable cause to believe that the debtor was insolvent, but, did believe debtor was insolvent. Its actions, in first, insisting on C.O.D. sales, then even insisting on certified checks, and, finally, notifying the church that there was a credit problem and setting up a procedure to be followed on the church project, indicated that defendant believed bankrupt to be insolvent. Thus, certain elements of a voidable transfer are established. Bankruptcy Act of 1898, Sections 60a and 60b, 11 U.S.C. Sec. 96 (1970). The payment was a transfer of property a creditor made by the debtor while insolvent and within four months before the filing by him of a petition initiating a proceeding under the Act, the effect of which transfer enabled the creditor to obtain a greater percentage of his debt than some other creditor of the same class. Defendant had, at the time when the transfer was made, reasonable cause to believe that the debtor was insolvent.

However, defendant contends that the transfer was not for or on account of an antecedent debt. It claims that this was a C.O.D. transaction, as plainly marked on two orders. But, while the contracting parties agreed that the transaction was to be on a C.O.D. basis, and, two orders were so marked; the parties at no time treated the sale as C.O.D. and deliveries were made with no attempt to collect payment. Although the last delivery was made November 14, 1977, and payment was probably made three days later, the three day delay, or even less, would be sufficient to make the transaction one of credit.

Defendant also claims that, through its discussions with the church and bankrupt, it had a proprietary interest in the church's check and, therefore, this check was never the property of the bankrupt but was held by it in trust for defendant. It is true that in *Limperis v. Material Service Corp.*, 415 F.Supp. 65 (N.D., Ill., 1976), the court granted a summary judgment against the trustee where there was an agreement that the owner in a construction case would issue checks to the bankrupt which would endorse them while still in owner's possession, and, the owner would then deliver the checks to the defendant. The court found that a trust existed, that bankrupt never had a beneficial interest in the checks, and, therefore, there was no preferential transfer. But, there was no such arrangement in this case. The church issued and delivered its check unendorsed to bankrupt which deposited the same in its own bank account, on which it issued its check to defendant. Much closer to our facts is *San Mateo Feed & Fuel Co. v. Hayward*, 149 F.2d 875 (9th Cir., 1945). There, within four months of filing, bankrupt delivered four checks to defendant creditor made payable to the bankrupt contractor and creditor, a materialman. These checks were written by the owner. This was according to the practice of the owner, but, there was no evidence that there was an agreement to do so. Judgment for the trustee was affirmed by the District Court and Court of Appeals. In our case, there was not even a joint check issued by the church. Thus, I cannot find that defendant had any proprietary interest in the church's check which was in the full amount due the bankrupt, a sum somewhat larger than the amount due defendant for the job.

Although, not originally raised by the parties, the court was concerned about the impact of the so called "Builders Trust Fund Act" of Michigan, Act 259, P.A.1931,

Mich.Comp.Laws Sec. 570.151, [Mich.Stat. Ann. Sec. 26.331 (Callaghan 1970)] et seq. Sec. 1 of this Act, Mich.Comp.Laws Sec. 570.151 provides:

"In the building construction industry, the building contract fund paid by [any person] to a contractor, or by [such person] or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the [person making the payment], contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes."

If defendant is entitled to protection under the "Builders Trust Fund Act," it must prevail in these proceedings. *Selby v. Ford Motor Co.*, 590 F.2d 642 (6th Cir., 1979). See also *Parker v. Klochko Equip. Rental Co., Inc.*, 590 F.2d 649 (6th Cir., 1979), *National Bank of Detroit v. Eames & Brown, Inc.*, 396 Mich. 611, 242 N.W.2d 412 (1976), *B. F. Farnell Co. v. Monahan*, 377 Mich. 552, 141 N.W.2d 58 (1966).

Thus, our issue is whether bankrupt and defendant were engaged in the "building construction industry" in their activity relating to the church job. Act 259, *Supra.*

According to *General Insurance Company of America v. Lamar Corp.*, 482 F.2d 856, 860 (6th Cir., 1973), Act 259 was a depression measure to provide relief to subcontractors and materialmen on construction projects from having the general contractors use funds received from a particular project for payment of past debts. In these building construction jobs, a subcontractor, laborer or materialman might well have a major portion of its assets tied up in one job. The title to this 1931 Act was:

"AN ACT to protect the people of the state from imposition and fraud in the building construction industry and to provide penalties for the violation of this act."

Section 2 of the Act provided that, if any proceeds are retained by a contractor for any other purpose than to first pay laborers, subcontractors or materialmen with intent to defraud, he could be guilty of a felony.

What is the building construction industry? Websters New Collegiate Dictionary defines a building as "a usual roofed and walled structure for permanent use (as for a dwelling)" or "the act or business of assembling materials into a structure." Random House College Dictionary (1973) defines a building as "a relatively permanent, essentially box like construction having a roof and used for any of a wide variety of activities as living, entertaining, or manufacturing." Another definition is "anything built or constructed" and again, "the act, business or practice of constructing houses, office buildings, etc." In *Hopkins v. Dept. of Labor and Industries*, 190 Wash. 251, 67 P.2d 872 (1937) the issue was whether respondent qualified as being in the "building industry" so as to qualify for more favorable workmans compensation rates. Respondent manufactured boilers, large steel refuse burners, large oil tanks, and large steel smoke stacks. Because of their size, these items had to be assembled on the premises of the purchasers. After citing many decisions as to the meaning of "building," the court concluded,

"To be in the 'building industry,' one must certainly be in the business of constructing 'buildings,' which is not the business of this respondent." 67 P.2d, *Supra*, at 875.

The scope of Act 259 as defined by the legislature must be compared to the extensive description of the persons to be protected by the Michigan Mechanics' Lien Law in Mich.Comp.Laws Sec. 570.1 [Mich.Stat.Ann. Sec. 26.281 (Callaghan)], which provides in part:

"Every person who shall, in pursuance of any contract, express or implied, written or unwritten, existing between himself as contractor, and the owner, part owner or lessee of any interest in real estate, build, alter, improve, repair, erect, ornament or put in, survey or plat any lot or parcel of land, or portion thereof, or engineer or design any sewers, water lines, roads, streets, highways, sidewalks,

or prepare and furnish pursuant to such contract to such owner, part owner or lessee of any interest in real estate any survey, plat, plat of survey or design or engineering plan, or plans, for the improvement of any lot or parcel of land not exceeding one-quarter section of land, or who shall furnish any labor or materials in or for building, altering, improving, repairing, erecting, ornamenting or putting in any house, swimming pool, building, machinery, wharf or structure, or who shall excavate, or build in whole, or in part, any foundation, cellar or basement for any such house, [swimming pool,] building, structure or wharf, or shall build or repair any sidewalks, sewers, sewage disposal equipment, water lines and pumping equipment or wells or shall furnish any materials therefor, or shall furnish any nursery stock, or labor in connection therewith for any property, or shall rent or lease equipment in connection therewith for any property, and every person who shall be subcontractor, laborer, or materialman, perform any labor or furnish materials or shall rent or lease equipment to such original or principal contractor, or any subcontractor, in carrying forward or completing any such contract, shall have a lien therefor * * "

Under this act, even an installer of gas ranges in an apartment house, which only required connecting to a gas fixture, was held to be protected. *Peninsular Stove Co. v. Young*, 247 Mich. 580, 226 N.W. 225 (1929).

None of the cases arising under the Michigan Building Trust Fund Act, have raised the issue of whether the project in question was included in the building construction industry. In *Club Holding Co. v. Flint Citizens Loan and Investment Co.*, 272 Mich. 66, 69, 261 N.W. 133 (1935), the court merely refers to the "furnishing and hauling materials under contract." Again in *B. F. Farnell Co. v. Monahan, .Supra*, there is no mention of the nature of the project. In *Selby v. Ford Motor Co., Supra*, the project was the building and installation of conveyors at a Ford plant. Since there were six-teen subcontractors on the job, it is obvious that this was a major construction project. *Parker v. Klochko Equip. Rental Co., Inc., Supra*, merely refers to "public and private construction projects." In *People v. Miller*, 78 Mich.App. 336, 259 N.W.2d 877 (1977), where the court mentioned that this was the only criminal case under the Act to reach the appellate courts, the project was a swimming pool, but, again no issue was raised as to whether a swimming pool was covered by the Act.

In this case, there was no testimony as to the scope of the installation work on the church site. Materials were delivered to the church and within a day after the delivery of the last materials, the church issued its check. The parties testified that bankrupt was to realize a 10% profit. If this were so, the amount reserved for installation costs was nominal.

I cannot believe that the Michigan Legislature intended the words "Building Construction Industry" to encompass the sale of air conditioners to a small church such as we have in this case. If it had, it would have used the same carefully selected and inclusive language used in the Michigan Mechanics' Lien Law.

Thus, I find that there was no trust and that there was a preferential transfer.

Judgment may be entered for the plaintiff and against the defendant for $7,466.13. No costs are allowed.