In re HART SKI MFG. CO.,
INC., Debtor.

AETNA BUSINESS CREDIT,
INC., Plaintiff,

v.

HART SKI MFG. CO., INC., The First
National Bank of St. Paul, and the
Unsecured Creditors' Committee of Hart
Ski Mfg. Co., Inc., Defendants.

Bankruptcy No. 3–80–200.
Adv. No. 80–45.

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Dec. 10, 1980.

Richard D. Holper, Kutak Rock & Huie, Minneapolis, Minn., for plaintiff.

Robert S. Brill, Doherty, Rumble & Butler, Minneapolis, Minn., for defendant, Hart Ski Mfg. Co., Inc.

Andrea M. Bond, Briggs & Morgan, St. Paul, Minn., for defendant, The First Nat. Bank of St. Paul.

William I. Kampf, St. Paul, Minn., for defendant, the Unsecured Creditors' Committee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JACOB DIM, Bankruptcy Judge.

This matter came on for trial on July 15, 1980 upon the complaint of Aetna Business Credit, Inc. (Aetna) for declaratory judgment. The complaint sought a determination of Aetna's liability on certain guaranties issued by Aetna for Hart on letters of credit obtained by Hart through First Bank. The Committee intervened as a party–defendant, claiming the transaction to be a voidable preference.

The parties have agreed to and submitted a Partial Stipulation of Fact and based on the Stipulation and on all the records, files and papers, together with the arguments of counsel, the Court makes the following:

## FINDINGS OF FACT

1. On November 15, 1979, Hart needed $182,141.00 in five irrevocable letters of credit to purchase skis from a European manufacturer, Dynamic, S.A. The letters of credit had to be transmitted to and verified by a French bank, Credit Lyonaise, before the skis would be shipped.

2. Hart contacted First Bank to obtain the letters of credit. The bank agreed to issue the five letters of credit which were to be guarantied by Aetna. Hart told the bank that time was of the essence, and the bank agreed to transmit the letters of credit as soon as possible.

3. Hart completed written applications for the letters of credit. First Bank confirmed by telephone that Aetna would guarantee Hart's obligation on the letters of credit.

4. The terms of the letters of credit, as set forth in the written application of Hart, required the shipper to have bills of lading for the skis dated no later than November 30, 1979 on four letters of credit numbered 5332, 5333, 5334 and 5336; and, no later than December 5, 1979 on the fifth letter of credit numbered 5335. The drafts drawn on the four letters of credit had to be presented by December 15, 1979; and, by December 20, 1979 on the fifth letter of credit. Payment was to be made by First Bank within 90 days from the date of the bills of lading.

5. Despite earlier attempts, due to transmission difficulties, First Bank was unable to transmit verifiable letters of credit until November 26, 1979.

6. On November 24, 1979, prior to the successful transmission of the letters of credit, Hart received notice from Dynamic, S.A. that it would be unable to comply with the terms of the letters of credit regarding the bills of lading date because of the delay in receipt of the letters of credit.

7. Hart informed First Bank of the problem and requested First Bank to change the bills of lading date to December 15, 1979 and the draft presentment date to December 30, 1979 on all five letters of

credit. The letters of credit were changed by First Bank in accordance with the request of Hart.

8. Aetna issued its written guaranties on the letters of credit on November 26, 1979. The guaranties stated that the letters of credit must be issued pursuant to the written applications executed by Hart. The guaranties expired March 31, 1980.

9. Aetna was never notified of the changes requested by Hart and made by First Bank in the letters of credit.

10. The bills of lading submitted by the shipper, Dynamic, S.A. were all dated after November 30, 1979 but prior to December 15, 1979. All drafts were presented after December 15, 1979 but prior to December 30, 1979.

11. Hart filed a voluntary petition under Chapter 11 of the Bankruptcy Code on February 13, 1980.

12. First Bank paid on the drafts drawn under the letters of credit between March 3, 1980 and March 13, 1980, within the 90 days from the bills of lading date and prior to the expiration of the Aetna guaranties on March 31, 1980.

13. First Bank, after obtaining bankruptcy court approval, made timely demand on Hart and Aetna for payment on the letters of credit.

14. Aetna charged Hart a fee for the guaranties of .5% of the outstanding balance per month. The fee has not been collected, but it has been charged to the account of Hart with Aetna.

## ISSUES OF LAW

1. Were the letters of credit transmitted by First Bank issued upon the written application executed by Hart, thereby binding Aetna to accept the changes?

2. Were the changes made in the letters of credit sufficient to release Aetna from its liability under the guaranty?

3. Was the transaction among Hart, First Bank and Aetna a preference?

4. Is First Bank entitled to interest from March 31, 1980 from Aetna?

## CONCLUSIONS OF LAW

1. The applications to the Bank, executed by Hart, state in paragraph 13 that "in the event of any change or modification with respect to: . . . (c) the drawing, negotiation, presentation, acceptance, the maturity of any drafts, acceptances or other documents, or (d) any of the other terms or provisions of the credit, such being done at the request of the Applicant, this Agreement shall be binding upon the Applicant in all respects with regard to the credit so changed or modified."

2. The changes made in the letters of credit were done at the request of Hart.

3. The changes in the letters of credit were made pursuant to paragraph 13 of the applications, were binding on Hart, and the letters of credit were issued pursuant to the written applications of Hart.

4. Aetna issued its guaranties on November 26, 1979 after the changes had been made in the letters of credit by Hart and First Bank. Under Minn. Stat. § 513.01 a guaranty must be in writing to be effective.

5. Aetna guaranteed Hart's obligation as it existed at the time the guaranties were issued, November 26, 1980.

6. Aetna was a compensated guarantor. It received a fee for issuing the guaranties and stood to gain from any improvement in Hart's financial position by virtue of its first security interest in Hart's assets and Hart's precarious financial position. *Dewey v. Henry's Drive–Ins of Minn. Inc.*, 301 Minn. 366, 222 N.W.2d 553 (1974); *Vanderuest v. Kauffman Pizza, Inc.*, 60 Wis.2d 230, 208 N.W.2d 428 (Wis.1973).

7. Aetna as a compensated guarantor is not entitled to application of the rule of *strictissimi juris* under which any change in the principal contract without the consent of the guarantor discharges the liability of the guarantor. This rule applies only to gratuitous guarantors who receive no benefit from the guaranty.

8. Aetna is released from its liability under the guaranties only if there was a

**468**

material change in the letters of credit, made without the consent of Aetna, which prejudiced the rights of Aetna.

▮ 9. The changes made in the letters of credit were made before Aetna issued its guaranties. The changes did not alter the liability of Aetna under its guaranties. The changes did not alter the amounts, methods or time of payment by Aetna or Hart. The changes were not material.

10. The changes made in the letters of credit were not prejudicial to the rights of Aetna. Demand was made on Hart and Aetna before the expiration of the guaranties and after all the conditions of the letters of credit had been met. Hart received what it had purchased. First Bank performed its obligations. Aetna was benefited by Hart's purchase.

11. Aetna is not released from its liability under the guaranties it issued for the letters of credit.

12. A preference is defined in § 547(b) as a transfer of the property of the debtor:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of filing of the petition, if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

13. A transfer of the property of the debtor is defined in § 101(40) as:

every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest.

▮ 14. Hart incurred the debt to First Bank on November 26, 1979 when the letters of credit were issued by First Bank. A debt is not incurred until the debtor obtains an interest or right in property. Hart obtained no right or interest in the irrevocable letters of credit until they were issued and transmitted by First Bank. At that point First Bank was obligated to honor drafts properly drawn on the letters of credit.

▮ 15. The transfer of the debtor's property occurred on November 26, 1979 when the guaranties of Aetna were issued. Aetna, on that date, received the right to collateralize its obligation under the guaranties out of the property it had as security under its financing agreement with Hart. This right, under § 547(e)(1)(B), could not be defeated by a creditor on a simple contract who acquires a judicial lien.

▮ 16. The transfer was not for or on account of an antecedent debt as required by § 547(b)(2) and therefore not a preference.

17. Even if the date the debt was incurred was November 16, 1979, the transaction is not a preference under § 547(c)(1) which states:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

18. § 547(c)(1) was intended to codify the rule of *Dean v. Davis*, 242 U.S 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917) and *National*

*City Bank v. Hotchkiss*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913). These cases held that it is the intention of the parties at the outset which determines whether the transfer was contemporaneous.

19. It was intended by Hart, Aetna and First Bank that the guaranties be issued simultaneously with the letters of credit.

20. The transfer was in fact substantially contemporaneous. The transfer occurred within 10 days of November 16, 1979, and prior to the time the letters of credit were transmitted. See *Dean v. Davis*, supra.

21. Under § 547(c)(2) there is no preference which may be avoided if the transfer was:

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms.

22. Hart was in the business of wholesale selling of skis. Because of manufacturing problems, Hart had been purchasing skis from a European supplier. The purchase was in the ordinary course of Hart's business.

23. The method by which the skis were purchased, using irrevocable letters of credit, is the ordinary method for purchasing from overseas suppliers.

24. The transfer, the guaranties of Aetna, is a normal and common method of securing letters of credit. Aetna had in previous transactions guaranteed the indebtedness of Hart.

25. The transfer was made within 45 days after Hart incurred the debt to First Bank.

26. The letters of credit and the guaranties were issued according to ordinary business terms.

27. There was no preference in the issuing of the guaranties by Aetna and in Aetna's collateralization of the guaranties under the financing agreement between Hart and Aetna.

28. On March 31, 1980 when First Bank made demand for payment on Aetna and Hart, Hart had already filed its voluntary petition under Chapter 11 on February 13, 1980.

29. The guaranties of Aetna require it to pay any amounts owing to First Bank by Hart.

30. § 502(b)(2) disallows any claim for unmatured interest on an unsecured debt. Unmatured interest is interest accruing after the date the petition is filed. As between Hart and the bank, the bank was unsecured.

31. Hart, under § 502(b)(2), could not owe First Bank any interest since such interest would not accrue until March 31, 1980 after the petition was filed on February 13, 1980.

32. Aetna's obligation is limited to the obligation owed by Hart to First Bank. Hart could not owe First Bank interest, therefore, Aetna is not liable for such interest. First Bank should not be allowed to accomplish indirectly what it could not accomplish directly under § 502(b)(2).