In re GAILDEEN INDUSTRIES, INC., Debtor.

Edward M. WALSH, Trustee, Appellant,

v.

SMYTHE BUICK ISUZU, Appellee.

BAP No. NC–86–1240–VEAS.

BK No. 4–84–01233 WW.

Adv. No. 3–84–0520 OAK JR.

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued and Submitted July 24, 1986.

Decided Feb. 26, 1987.

---

Dennis D. Davis, Goldberg, Stinnett & MacDonald, San Francisco, Cal., for appellant.

Bernd Schmidt, San Jose, Cal., for appellee.

Before VOLINN, ELLIOTT and ASHLAND, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge.

The Chapter 7 trustee sought to avoid certain payments made to Smythe Buick, Inc. dba "Smythe Buick Isuzu." The trustee and Smythe each moved for summary judgment. Trustee appeals from summary judgment in favor of defendant Smythe. We affirm.

At the outset, we recognize that the burden is on the moving party in a summary judgment motion, to establish that there are no genuine issues of material fact thereby warranting a disposition of the case on the basis of applicable legal principles. *In re Stephens*, 51 B.R. 591, 594 (9th Cir.BAP 1985). We hold that the defendant Smythe met this burden and affirm.

## I. FACTS

### A. Debtor's Business

The Debtor, Gaildeen Industries, Inc. dba "Land, Sea and Air" was in the business of conducting special "car sales" for invited customers. It obtained cars for such sales from dealers. This appeal is from a preference action concerned with a particular sale held in March 1984: the Concord Auto Sale.

### B. Past Dealings With Defendant

Smythe had previously, in 1982, participated in a Gaildeen sale at which 10 or 12 cars were sold and also made 6 or 8 individual sales to Gaildeen between 1982 and 1984. Smythe stopped doing business with Gaildeen because of its late payments (10 to 30 days after delivery to Gaildeen), Gaildeen's late return of a car lent for an executive's use, and the feeling of Smythe's fleet manager, Joseph Cossell, that Gaildeen was not a "good outfit to do business with."

### C. Concord Auto Sale

The Concord Auto Sale at the Concord Pavilion was a two day sale starting Saturday, March 3, 1984. Its customers were members of the California Teachers Association and state employees. Gaildeen purchased the cars from various participating dealers and delivered sales documents to buyers at the sale. Gaildeen resold approximately 250 cars to consumers at the Concord Auto Show.

Initially, Smythe was not willing to participate. It relented after Gaildeen agreed to let Smythe participate at no cost, to pay Smythe's shipping costs, and to pay Smythe the day of the sale with the funds received from the resales. Gaildeen had Smythe's vehicles only for resale and not to purchase them for its purposes. Some language was negotiated by Smythe and Gaildeen and added to Gaildeen's standard form Dealer Participation Agreement to provide that Gaildeen was to "pay for every vehicle sold by draft at time of sale." Gaildeen's trucker picked up cars from Smythe and even though Smythe did not receive the signed agreement, Smythe sent 20 cars to the sale after calling Gaildeen and being told that the agreement had been signed and sent to Smythe. Eleven of the 20 cars delivered were sold.

Smythe's fleet manager attended the sale to answer questions from people inspecting cars and did "paperwork" when notified that a customer was buying a car. This involved registering the car to Gaildeen for resale and making out a separate purchase order for each car. The purchase orders in the record appear to show

Smythe as seller and Gaildeen as buyer. Each also shows the date payment is due as March 4, 1984—the last day of the Concord Auto Sale.

### D. Payment

According to Cossell, it was anticipated that Gaildeen would honor the drafts promptly, but not necessarily the day of the sale. Although he requested payment at the end of the sale and on March 5, it was not until March 7 that Cossell received drafts dated March 5, 1984.

The 11 drafts used here are each entitled "Vehicle Purchase Draft," stating that payment would be "upon presentation of this draft to the bank named below [Wells Fargo Bank] with all duly executed documents specified on the back hereof." Smythe occasionally, about 5 percent of the time, did business with drafts but preferred checks. Al Green, a Gaildeen officer, told Cossell that drafts were furnished to ensure that the documents were made out correctly prior to issuing cash.

### E. Processing the Drafts

Smythe employees stated that it took two to three weeks for a draft to clear. They usually would process drafts the same day received or occasionally a day or so late.

A Smythe employee stated that it was the custom in the industry for title to pass when the purchaser's bank paid the draft in full. If unpaid, the documents were returned to the payee bank and the seller.

The deposit slips prepared by a Smythe employee were each dated March 13. The slips and drafts were forwarded to Smythe's bank and receipted for on March 14 by that bank—First Interstate Bank's Westgate Branch in San Jose.

Todd Perry, a Wells Fargo Bank employee, described practices concerning "automobile drafts"—which are documents encompassing the legal papers for a purchase issued by one dealer to another dealer. The draft envelope and documents are sent to the buyer's bank and reviewed by the buyer before payment is made. Normally, the time limit for honoring automobile drafts is 72 hours unless otherwise stated on the draft or the other (collecting) bank's collection letter. Perry testified that it was Wells Fargo's procedure to contact Gaildeen's president who would allow or reject drafts received by the bank. Before being paid, the draft envelope needed to contain documents necessary for title transfer of the automobile.

The deposit slips with the drafts were received by First Interstate Bank on March 14, 1984. "Collection notices" prepared by Wells Fargo Bank for each draft submitted to it were dated March 20, 1984. Perry could not state if the drafts had been presented to Wells Fargo before. If a draft was rejected and resubmitted, a new collection letter was made up. No copies of unpaid collection letters were kept.

The drafts were paid on March 21 and on March 22. Each of the drafts paid on March 22 bears a stamp "Returned Unpaid" dated March 21; each such stamp was crossed out. Perry testified that these stamps would have been placed there in error—if the draft had been returned unpaid, that collection advise would not have been reused to indicate payment.

There is testimony by Mr. Green that "because of the huge success of the special automobile sale, it took extra time to transfer the money to insure the drafts from Land Sea Air to Smythe Buick Isuzu would be honored."

On March 21, Cossell called Green because the drafts had not yet been honored. He also called Wells Fargo Bank in Los Angeles and an unidentified individual told him that Gaildeen was "just not honoring drafts" although there was no defect in the paperwork that she knew of. This hearsay statement does not refer or relate to any particular draft in question. In any event, Green told Cossell that Gaildeen would approve the drafts with the understanding that their "deal was different" and the drafts would be approved because they were to be paid immediately.

### F. The Aftermath

On March 27, 1984, various dealers who were not paid obtained writs of attachment against Gaildeen's bank account. On April 11, 1984, an involuntary bankruptcy peti-

tion was filed against Gaildeen by three dealer creditors.

## II. ISSUES

### A.

The trustee contends that the foregoing record warrants the following conclusions: eleven automobiles were sold to Gaildeen on March 3, 1984, for which payment was not made until March 23, 1984. The purchase orders reflect that each vehicle was "sold" to the debtor for the purposes of "resale." Smythe bargained for payment the date of the Concord Auto Sale. Instead, it received automobile drafts which did not result in payment upon presentation to the issuing auto dealer's bank. Rather, the practice was for the issuing dealer's bank to call the dealer to obtain approval for payment and if such approval was not received, the draft was not honored. The trustee argues that such a draft does not constitute payment, but only a promise to pay within 72 hours (the normal time limit for such automobile drafts) or some other specified time. The trustee acknowledges, but does not address the fact that these sight drafts were to be honored on sight, as opposed to the normal 72 hour collection period. He argues further that there were inexplicable delays in processing the drafts internally at Smythe which could only be the result of some defect in the drafts which delayed their presentment.

### B.

Smythe argues that the drafts were processed in a timely fashion and that any delays were occasioned by work load and intervening weekends. Smythe points to the success of the auto show as the reason for a "slight delay" in processing the paperwork and also points to the preparation and receipt of the drafts on March 5, 1984, as the debtor's compliance with the agreement for timely payment.

Smythe further argues that the court's holding that the transfers from Gaildeen to Smythe were contemporaneous and within the ordinary course of business are supported by the evidence. It asserts that Smythe had a security interest in the sales proceeds of each vehicle and that the transaction involved "trust receipt financing" which is "an accepted practice in the automobile industry." Smythe argues that it held the new car report and certificate of origin until Gaildeen turned over the sale proceeds from the automobiles.

Also, Smythe describes the transaction between Smythe and Gaildeen as a "secured transaction." Smythe also argues that the delivery of the 20 vehicles to Gaildeen was not meant to transfer ownership.

### C.

Smythe did not argue in its brief in support of summary judgment nor in its appeal brief that the elements of a preference were not met by the trustee. Rather, its arguments are based solely on the contemporaneous exchange exception, 11 U.S.C. § 547(c)(1), and ordinary course exception, 11 U.S.C. § 547(c)(2), and to a lesser extent the security interest defense, 11 U.S.C. § 547(c)(3). Therefore, we shall assume that Smythe does not contest any of those elements and shall examine the applicability of the exceptions.

## III. CONTEMPORANEOUS EXCHANGE EXCEPTION

### A.

This case was commenced before the enactment of the 1984 amendments to the Bankruptcy Code. "Except as otherwise provided in this section the amendments made by this title shall become effective to cases filed 90 days after the date of enactment of this [Bankruptcy Amendments and Federal Judgeship Act of 1984]." P.L. 98–353 § 553(a). Therefore, the language of Section 547 in effect before the amendments applies to the Gaildeen case and this preference avoidance action.

Section 547(c)(1) provides:
(c) The trustee may not avoid under this section a transfer—
(1) to the extent that such transfer was—
 (A) intended by the debtor and the creditor to or for whose benefit such

transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange ...

Smythe, in support of its claim to this exception, refers to:

1. the affidavits of Ed Green, one of Gaildeen's officers, and Joseph Cossell, Smythe's fleet manager, stating that the transfer of the vehicles and payment was *intended* to be contemporaneous;

2. the drafts, prepared on March 5, 1984, the day after the Concord Auto Show ended and given to Smythe on March 7; the drafts thereafter having been processed in the ordinary manner by Smythe and sent to its bank for collection.

The legislative history of Section 547(c)(1) specifically references transactions in which checks are involved.

Normally, a check is a credit transaction. However, for the purposes of this paragraph, a transfer involving a check is considered to be "intended to be contemporaneous," and if the check is presented for payment in the normal course of affairs, which the Uniform Commercial Code specifies as 30 days, U.C.C. § 3–503(2)(a), that will amount to a transfer that is "in fact substantially contemporaneous."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5963, 6329.

Section 3–503(2)(a) of the Uniform Commercial Code, referenced in the legislative history, appears at Section 3503 of the California Commercial Code:

(2) A reasonable time for presentment is determined by the nature of the instrument, any usage of banking or trade and the facts of the particular case. In the case of an uncertified check which is drawn and payable within the United States and which is not a draft drawn by a bank the following are presumed to be reasonable periods within which to present for payment or to initiate bank collection:

(a) With respect to the liability of the drawer, 30 days after date or issue whichever is later ...

"This exception was designed to protect transfers made by ordinary checks which are deposited and honored in the normal course of business affairs—within thirty days of delivery ... This exception thus protects transfers that are not intended to be—but are technically—on account of antecedent debt." Note, "Timing of Payments by Check under Section 547 of the Bankruptcy Code," 7 Cardozo Law Review No. 3, pp. 893–94 (Spring 1986).

### B.

The applicability of the grace provided check transactions by Section 547(c)(1) to the present case depends upon a comparison between checks and drafts, specifically sight drafts, an issue that was not explored by either party.

For definitions of the two instruments, we turn to the Uniform Commercial Code:

§ 3104. Form of Negotiable Instruments; "Draft"; "Check"; "Certificate of Deposit"; "Note". (1) Any writing to be a negotiable instrument within this division must

(a) Be signed by the maker or drawer; and

(b) Contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this division; and

(c) Be payable on demand or at a definite time; and

(d) Be payable to order or to bearer.

(2) A writing which complies with the requirements of this section is

(a) A "draft" ("bill of exchange") if it is an order;

(b) A "check" if it is a draft drawn on a bank and payable on demand;

(c) A "certificate of deposit" if it is an acknowledgment by a bank of receipt of money with an engagement to repay it;

(d) A "note" if it is a promise other than a certificate of deposit ...

For further elucidation, we turn to a treatise, Barkley Clark, *The Law of Bank Deposits, Collections, and Credit Cards* (Warren, Gorham & Lamont (rev. ed. 1981). Because of its usefulness in clarifying the terms used in this case, we quote the following sections liberally:

¶ 1.1 Checks and Drafts on Instruments of Payment

[1] Definitions

The most common bank collection item is the draft, also known as a "bill of exchange," which is defined in Section 3–104 as an *order* by a *drawer* to a *drawee* to pay money to the *payee* or other third party to whom the payee has transferred the item. The most typical draft is of course the garden-variety *check*, which is a *draft drawn on a bank payable on demand.*

\* \* \* \* \* \*

¶ 7.1 THE DRAFT AS AN INSTRUMENT OF PAYMENT

Unlike the common check, the "draft" retains an air of mystery together with a hint of high finance and the aroma of large-scale business transactions. But most people forget that the common check is only a specialized form of the draft. The Uniform Commercial Code (UCC) defines a "draft" as an unconditional written order signed by the drawer to pay a sum certain in money; the order is a "check" when it is directed to a bank as drawee and is payable on demand. If the order is directed to some other third person, such as the buyer under a contract of sale, it retains the name "draft."

[1] Sight Draft v. Time Draft v. On Arrival Draft

Commercial parlance often uses the rather inexact terms of "sight draft" versus "time draft." Both terms refer to the maturity date of the draft: A sight draft is payable on demand while a time draft is payable a certain time after acceptance by the drawee or after "sight." (Emphasis in original; footnotes omitted.)

The eleven automobile drafts used in the Smythe transaction each state that "Upon presentation of this draft to the bank named below with all duly executed documents specified on the back hereof, [shall] pay to Smythe Isuzu...." Each draft is "payable through" Wells Fargo Bank.

The ordinary "Vehicle Purchase Draft" used by Gaildeen was a "time draft;" that is, it usually would be honored within a certain period, after necessary title documents furnished with the draft are received, through ordinary banking channels. Clark, ¶ 1.1[1]. As previously indicated, the standard time limit for honoring automobile drafts is 72 hours. Wells Fargo contacted Gaildeen when it received automobile drafts so that Gaildeen could accept the drafts.

It is undisputed that in this case a "sight draft" was used. It was to be paid upon demand or presentment. Clark, ¶ 1.1[1] and ¶ 7.1[1]. "Instruments payable on demand include those payable at sight or on presentation and those in which no time for payment is stated." Cal.Commercial Code § 3108 (West 1964).

The statements of Todd Perry of Wells Fargo do not specifically address the internal treatment of sight drafts in the collection and payment process. On the basis of the record presented to us, it appears that the sight drafts in this case were identical to checks in their processing and effect: they had a payment function, not a credit function. This is consistent with the record showing that drafts were widely used in the automobile industry, as indicated above.

### C.

■ Because the sight draft appears to be the practical and legal equivalent of a check in this case, the law applicable to checks and cash equivalents in Section 547(a)(1) cases would also apply here. Section 547(a)(1) protects transfers involving payment by check as contemporaneous exchanges—the only exception being if a check is dishonored by a bank upon its presentation; such dishonor transforms the transaction into a credit transaction. *In re Standard Food Services, Inc.,* 723 F.2d 820, 821 (11th Cir.1984).

Contrary to language contained in the House report, payment of a debt by means of a check is equivalent to a cash payment unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2).

124 Cong.Rec. H11,097 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17,414 (daily ed. Oct. 6, 1978) (both versions using identical language) (emphasis added). Thus, the legislative history indicates that, when the check bounced, the transaction became a credit transaction.

*Id.* at 821.

Cases involving the receipt of payment by check before the ninety day preference period, with negotiation and/or final payment within the period are also instructive: "A debtor's payment by check on an existing debt, presented to the bank within a reasonable time and honored by the bank, is deemed made at the time the debtor gave the check to the creditor." *In re Kenitra, Inc.,* 797 F.2d 790 (9th Cir.1986), citing *Shamrock Golf Co. v. Richcraft, Inc.,* 680 F.2d 645 (9th Cir.1982) *petition for cert. filed* Nov. 17, 1986, and *In re Walker Industrial Auctioneers, Inc.,* 45 B.R. 452 (Bankr.D.Or.1984).

We hold that payment by sight draft shall be treated in this case as equivalent to payment by check.

## D.

■ The trustee does not dispute that the parties *intended* that this be a contemporaneous transaction, but contends that it does not meet the second element of the exception in that it was not *in fact* contemporaneous. He argues that certain aspects of the transaction militate against the "contemporaneous exchange" interpretation.

First, the trustee contends that release of title documents withheld until payment does not constitute "new value." It appears that all title transfers were accomplished during the auto sale at the time of the sales to the customers as required by law. *English v. Ralph Williams Ford,* 17 Cal.App.3d 1038, 95 Cal.Rptr. 501 (1971).

The trustee argues that there was a delay in the actual payment of the drafts—that payment by Wells Fargo to First Interstate in the form of cashier's checks is the point at which the transaction should be treated as having been completed. However, the discussion above concerning the negotiation of drafts leads us to conclude that payment was made as of the time of delivery of the drafts, not as of final payment by the bank. This is in accord with the law concerning the negotiation of checks under section 547 cited and discussed above.

The trustee cites authority that even minor delays in the delivery of payment may take a transaction out of the contemporaneous exchange exception. *See In re Skilled Trades Co.,* 1 B.R. 396 (Bankr.W.D.Mich. 1979). He points to the demand of Smythe and agreement of Smythe and Gaildeen that payment would be made the day of the auto sale. There is a reference to possible delays resulting from the volume of transactions at the Concord Auto Sale and the necessity of seeing whether the checks delivered by customers/purchasers would clear.

The trustee, however, has not supplied any statement of a relevant or appropriate nature indicating that the Gaildeen drafts were dishonored when they were submitted to Wells Fargo by First Interstate. The statement by Todd Perry indicates that it cannot be shown from the bank records that they were dishonored. His statement concerning Wells Fargo's action placing the "Returned Unpaid" stamps appearing on some of the drafts was in error was not disputed by the trustee. The drafts were, in fact, all honored by the payment of the face amount of the drafts. Wells Fargo's collection notices for each draft are dated March 20, 1984, and the drafts were all approved for payment and paid on either March 21 or March 22.

Based upon the delivery of the drafts only three days after the end of the sale and upon payment of the drafts in the fashion described, it is undisputed that the drafts were paid promptly and in accordance with their terms. Therefore, we hold

that the drafts represent contemporaneous exchange for the automobiles sold through the Concord Auto Show and that the delivery and sale of the automobiles through Gaildeen constitutes new value for which Smythe is entitled to claim this exception to Section 547.

## IV. ORDINARY COURSE OF BUSINESS EXCEPTION

The pre–1984 text of Section 547(c)(2) reads:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(D) made according to ordinary business terms ...

The trustee argues that the parties had agreed to immediate payment in this case, and whatever the prior record of late payments between the parties, the evidence shows that the late payments were unacceptable to Smythe and Gaildeen was mandated to make immediate payment. Again, he points to the payment by cashier's check from Wells Fargo to First Interstate some three weeks after the auto sale as evidence that the payment was not timely and outside of the parties' normal course of dealings. He cites *In re Ewald Bros., Inc.*, 45 B.R. 52 (Bankr.D.Minn.1984) as authority that where late payments of one or two days were commonplace between the parties, payments made later (in that case, nine days) would be sufficient to take the transaction outside of the ordinary course of dealings between the parties and thus outside of the exception provided by the Bankruptcy Code.

 It is natural that a three week gap between the debtor receiving consider-

ation and the creditor getting cash for it would invite scrutiny. However, lapse of time does not per se divest payment of contemporaneous character. *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917); *In re Hart Ski Mfg. Co.*, 7 B.R. 465 (Bankr.D.Minn.1980); *In re Lyon*, 35 B.R. 759 (Bankr.D.Kan.1982). On the basis of the usual course of conduct between the parties, it appears that payment just a few days late was in accordance with, and followed the prior practice of, late payments made to Smythe by Gaildeen. The processing delays at the bank on the facts before us do not provide any evidence of disruption in the normal course of dealings between the parties. The late payments made to Smythe in this case are thus within the ordinary course of business dealings between them and the transaction falls within the ordinary course exception of Section 547.

## V. CONCLUSION

We recognize that in his reply brief, the trustee argues that there are controverted issues of fact which preclude summary judgment. With respect to the enumerated examples given, we believe that the court properly held that Smythe had met its burden of showing that there are no issues of fact.

The record before us supports the bankruptcy court's ruling that the contemporaneous exchange and ordinary course exceptions apply here. While Smythe may have been paid where other parties were not, it does not follow that any payments made during the sale may be avoided as preferences. The individual relationship between each creditor and the debtor is determinative.

AFFIRMED.